(198 P.3d 163)
No. 98,527

STATE OF KANSAS, *Appellee*, v. DEANN BUSSART-SAVALOJA, *Appellant*.

918

Opinion filed December 5, 2008.

*Jennifer E. Conkling*, of Kansas Appellate Defender Office, for appellant.

*Sherri Schuck*, county attorney, and *Stephen N. Six*, attorney general, for appellee.

Before GREENE, P.J., HILL, J., and BRAZIL, S.J.

GREENE, J.: Deann Bussart-Savaloja appeals her conviction of operating a vehicle while under the influence of alcohol (DUI), arguing (i) a delay in the appeal process violated her due process rights; (ii) K.S.A. 8-1001(i), allowing admission into evidence of a refusal to submit to a blood test, is unconstitutional under the Fourth Amendment to the United States Constitution; and (iii) the enhancement of her sentence by reason of a prior conviction violated *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We conclude that the delay in the appeal process may have been inordinate, but Bussart-Savaloja has not demonstrated sufficient assertion of her rights or actual prejudice to establish a constitutional violation. We also reject Bussart-Savaloja's challenge to the constitutionality of K.S.A. 8-1001(i) because there can be no derivative constitutional right to bar evidence of an invocation of something that itself is not a constitutional right. Finally, we conclude that Bussart-Savaloja's sentencing challenge is controlled by precedent from our Supreme Court. For these reasons, we affirm Bussart-Savaloja's conviction.

### Factual and Procedural Background

During a DUI checklane operated by the Pottawatomie County Sheriff's Department in April 2004, Kansas Highway Patrol Trooper Joseph Bullock observed Bussart-Savaloja's vehicle turn off the roadway onto a frontage road, park with its lights off, roll through a stop sign, and return the way it had come. Bullock began

following the car and observed that it was traveling more than 10 miles under the speed limit. When Bussart-Savaloja did not adjust her speed when changing from a 40-mile an hour zone to a 30-mile an hour zone, Bullock initiated a traffic stop.

Trooper Bullock testified that Bussart-Savaloja exhibited several signs of impairment, including bloodshot and watery eyes, fumbling through the same section of her pocket book over and over, and stating a confused travel plan (Bussart-Savaloja said she was traveling home when she was actually traveling toward Manhattan and away from her home in Wamego, Kansas). Bullock also detected a strong odor of alcohol and observed that Bussart-Savaloja was unsteady when she exited the car, mispronounced "alphabet" twice, and performed poorly on two field sobriety tests.

Bullock concluded that Bussart-Savaloja was impaired and placed her under arrest. After being informed of the implied consent advisories, Bussart-Savaloja agreed to submit to a breath test. Bullock began a 20-minute deprivation period but was unable to complete it when Bussart-Savaloja said she was going to vomit. Believing that Bussart-Savaloja had vomited, Bullock decided to change the test from a breath test to a blood test. Bullock again explained the implied consent advisories and explained the ramifications of refusing the test. Bussart-Savaloja refused the blood test because she worked at Mercy Hospital where the blood test was to be taken. According to Bullock's report, Bussart-Savaloja also refused because she said she was going to jail anyway and that she would be sober by the time everything was done. Bullock then transported Bussart-Savaloja to the Pottawatomie County jail for processing.

Bussart-Savaloja was charged with a DUI, third offense, and speeding. A 1-day jury trial was held on April 1, 2005. Bussart-Savaloja was found guilty and was sentenced to the custody of the Pottawatomie County jail for a period of 12 months on July 7, 2005.

Bussart-Savaloja filed a timely pro se notice of appeal on July 8, 2005. The district court stayed Bussart-Savaloja's sentence pending appeal. For reasons not apparent in the record on appeal, appellate counsel did not receive notice of appointment to this appeal until January 11, 2007. Each party to the appeal received three exten-

sions on its brief, and the appeal was not deemed ready for argument until June 2008. We heard oral argument in October 2008.

### Did the Delay in the Appeal Process Violate Bussart-Savaloja's Due Process Rights?

Bussart-Savaloja argues that the unexplained delay in processing her appeal violated her due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Although the United States Constitution does not require the State to afford a criminal defendant a direct appeal to challenge alleged trial court errors, the United States Supreme Court has held that if a State has created appellate courts as an integral part of its system for finally adjudicating the guilt or innocence of a defendant, the procedures employed in the appeal process must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution. *Evitts v. Lucey*, 469 U.S. 387, 393, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985); *McKane v. Durston*, 153 U.S. 684, 687, 38 L. Ed. 867, 14 S. Ct. 913 (1894).

Insofar as we can determine, this appeal appears to be the first to challenge timeliness in the appeal process in Kansas appellate courts. Because the reasons for constraining unreasonable appellate delay are analogous to the motives underpinning the right to speedy trial under the Sixth Amendment to the United States Constitution, we examine case law construing and applying speedy trial rights in assessing delays in the state appeal process. See *Harris v. Champion*, 15 F.3d 1538-1558-65 (10th Cir. 1994). We also note that in *Harris*, the Tenth Circuit Court of Appeals provided a suggested roadmap by which a state appeal process may be determined to be constitutionally ineffective because of unreasonable delay. See 15 F.3d at 1559.

In *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), the United States Supreme Court established a "balancing test" to determine whether a specific delay violates a defendant's right to a speedy trial. *Barker* identified four factors balanced to determine if a defendant's rights have been violated: (1) the length of delay, (2) the reason for the delay, (3) the de-

fendant's assertion of his or her right, and (4) prejudice to the defendant.

Although *Barker* addressed a defendant's right to a speedy trial, the Tenth Circuit subsequently adopted the *Barker* analysis in determining whether a defendant's due process right to a timely direct criminal appeal had been violated. *Harris*, 15 F.3d at 1559. The Tenth Circuit's analysis also expanded the prejudice element to include whether delay (i) caused the defendant to suffer oppressive incarceration pending appeal; (ii) caused the defendant to suffer constitutionally cognizable anxiety and concern awaiting the outcome of his or her appeal; or (iii) impaired the defendant's grounds for appeal or his or her defenses in the event of a reversal and retrial. 15 F. 3d at 1559. We apply the *Barker* factors as modified by *Harris* to determine whether delays in Bussart-Savaloja's appeal violated her due process.

### Length of delay

The first factor in the balancing test is the length of the appellate delay, and only the passage of an *inordinate* amount of time triggers due process concerns. If inordinate delay cannot be shown, we need not inquire into the other factors. And there is no inflexible length of time that will constitute inordinate delay in every case. For purposes of evaluating length of delay in state courts based on due process precedent from the Tenth Circuit, however, a 2-year delay in finally adjudicating a direct criminal appeal ordinarily will give rise to a presumption of inordinate delay that will satisfy this first balancing factor and compel examination of the other factors. *Harris*, 15 F.3d at 1559-60.

Although we have relied principally upon Tenth Circuit authority in applying this factor, we note that there is no inconsistency between federal authority and that of our own Supreme Court in examining delay for purposes of speedy trial. See, *e.g.*, *State v. Mathenia*, 262 Kan. 890, 894-97, 942 P.2d 624 (1997); *State v. Fitch*, 249 Kan. 562, 819 P.2d 1225 (1991); *State v. Goss*, 245 Kan. 189, 193, 777 P.2d 781 (1989).

Here, Bussart-Savaloja's notice of appeal was filed July 8, 2005, and we have not adjudicated her appeal until now. Moreover, the

State has not argued and we do not conclude that there were special circumstances present here that mitigate the length of delay. Accordingly, we must conclude that the delay in processing Bussart-Savaloja's appeal was presumptively inordinate, thus weighing in favor of a due process deprivation.

### *Reason for delay*

The second factor in the balancing test is the reason for the delay. When addressing this factor, purposeful delay weighs heavily against the government. A neutral reason, such as negligence or overcrowded courts, weighs less heavily but should be considered. The ultimate responsibility rests with the government rather than with the defendant. *Barker*, 407 U.S. at 531. And reasons such as lack of funding, briefing delay by court-appointed attorneys, and mismanagement of resources by public defender offices are not considered acceptable excuses for inordinate delay. *Harris*, 15 F.3d at 1562.

Analysis of the reasons for delay in this case is difficult because the record on appeal does not permit an exhaustive examination of what occurred. It appears the district court promptly appointed the Kansas Appellate Defender Office as appellate counsel for Bussart-Savaloja on July 14, 2005. This order was filed July 20, 2005, by facsimile to the district court clerk from prior counsel for Bussart-Savaloja, the cover sheet of which stated: "Please advise our office if you will notify the Appellate Defender's Office or if we need to do so." The record fails to reflect any activity thereafter until January 11, 2007, when a different district court judge again appointed "Jessica Kunen, Chief Appellate Defender" as counsel for the appeal. Obviously, 18 months of delay was incurred as a result of some issue in advising appellate counsel of appointment.

Thereafter, transcription delays were incurred between April 24, 2007, and October 9, 2007 (nearly 6 months), appellant briefing required until February 19, 2008 (over 4 months), and briefing by the State required until June 8, 2008 (nearly 4 months). After briefing was completed, this court set the matter on an argued docket for October 2008, and our decision is now being filed in early December 2008, within 6 months after case "ready". Of interest is

that these later delays totalling 19 months would not have pushed this appeal past the 2-year benchmark for presumptive delay had the initial 18-month unexplained delay not occurred.

Problems in the prompt appointment of appellate counsel and notification of the appointment have been a persistent problem to our court and are most often reflected in motions to docket appeals out of time. We note that such problems could be avoided by enforcement of K.A.R. 105-3-9, which provides:

"**Duties of trial counsel following sentencing**. (a) In order to protect a convicted defendant's right to appeal, it shall be the duty of each trial counsel to prepare, file, or both, the following documents:

(1) file a motion for modification of sentence pursuant to K.S.A. 21-4603(2), when appropriate;

(2) file a motion for release on appeal bond pursuant to K.S.A. 22-2804, when appropriate;

(3) file a notice of appeal in a timely manner, unless a waiver of the right to appeal has been signed by the defendant;

(4) upon filing the notice of appeal, obtain a court order for the trial transcript, and a transcript of any pretrial or posttrial proceedings from which a claim of error may arise;

(5) upon filing the notice of appeal, obtain an order from the district court appointing the state appellate defender as counsel for the appeal and file the order of appointment with the clerk of the district court withing five days of the filing of the notice of appeal;

(6) submit a draft of the docketing statement and all documents necessary to docket the appeal required by supreme court rule 2.041 to the appellate defender within 10 days of the filing of the notice of appeal; and

(7) submit a listing of all hearings in which a record was taken to the appellate defender, including dates, within 10 days of the filing of the notice of appeal.

"(b) Requests for compensation for services set forth in subsection (a) shall be included in the claim filed with the board."

This court has a constitutional duty to assure that our appeal process is not delayed in a manner that may implicate constitutional rights of appellants to due process. In order to avoid such delays in our appeal process in Kansas, we urge the Board of Indigents' Defense Services to take any and all steps to assure compliance with K.A.R. 105-3-9, including requiring a certification of compliance with this regulation as a prerequisite to compensation of trial counsel. We also urge appointed trial counsel throughout our state to comply with this regulation. Finally, we urge our district courts

to implement procedures within their districts to assure compliance with the regulation or otherwise assure prompt appointment of appellate counsel and notification of same.

The State has offered no constitutionally sufficient justification for the delays experienced in Bussart-Savaloja's appeal, and we must conclude that the reasons for delay cannot be attributed to the appellant and must be considered to have due process implications.

### *Appellant's assertion of right to a timely appeal*

The third factor we must balance in determining whether a due process violation has occurred is the appellant's assertion of her right to a timely appeal. Whether and how strongly an appellant asserts his or her right to a speedy appeal should be balanced with other factors. *Barker*, 407 U.S. at 528. "The more serious the deprivation, the more likely the defendant is to complain." 407 U.S. at 531.

Bussart-Savaloja argues that she asserted her rights by filing a notice of appeal 24 hours after sentencing. Subsequent to this notice of appeal, however, the record does not indicate, and Bussart-Savaloja does not point to, any assertions of her rights between July 8, 2005, and January 11, 2007. Bussart-Savaloja could have continued to move the court to hear her appeal, and the fact that she filed her notice of appeal pro se indicates an ability to do so. Also, working against Bussart-Savaloja's favor, when the docketing statement was first submitted to the court on April 24, 2007, the only issue proposed to be raised was a sufficiency of the evidence argument and it did not include an assertion that Bussart-Savaloja's due process rights had been violated by the delay in appointing counsel.

We are cognizant of the Tenth Circuit's refusal to require appellants to have made an affirmative assertion of their right to a timely appeal in order for this factor to weigh in their favor. *Harris*, 15 F.3d at 1563. The facts in *Harris*, however, were markedly different as to this factor. There, the petitioners were incarcerated and brought their claims through the vehicle of habeas corpus; here, Bussart-Savaloja received a suspension of her sentence pend-

ing appeal. Whereas the *Harris* petitioners had plenty of reason to assert their rights but may have been hampered by their circumstances (see *Harris*, 15 F.3d at 1563), Bussart-Savaloja had little or no reason to complain and perhaps some reason to remain quiet and hope her appeal died a quiet death on the desk of some court reporter or appellate defender.

The Tenth Circuit has recently held that where the defendant has not complained of the delay until after an unreasonable delay has occurred, this may be considered a failure to assert the right and should be held against the defendant. *United States v. Yehling*, 456 F.3d 1236, 1244 (10th Cir. 2006). This is consistent with other authorities holding that there should be no presumption a timely appeal is desired by defendants who are not in custody. See, *e.g.*, *United States v. Smith*, 94 F.3d 204, 210-11 (6th Cir. 1996) (a temporary release should provide strong evidence that a defendant has benefitted from delay, rather than been burdened by it). Under these circumstances, we conclude that Bussart-Savaloja's apparent silence throughout the first 18 months after the filing of her notice of appeal must be weighed against any due process violation.

### *Prejudice as a result of delay*

The fourth and final factor to be considered is whether the appellant has suffered any prejudice due to delay. Prejudice may result from any of the following: (i) oppressive incarceration pending appeal; (ii) constitutionally cognizable anxiety awaiting resolution of the appeal; or (iii) impairment of a defendant's grounds for appeal or a defendant's defenses in the event of a retrial. *Harris*, 15 F.3d at 1563-65.

Bussart-Savaloja argues that she has experienced considerable anxiety as a result of the length of time it has taken to adjudicate her appeal. She also argues that because she has not yet served her sentence, she has not had the opportunity to complete the inpatient treatment needed to combat her alcohol abuse. To establish prejudice as a result of anxiety, however, a defendant must make a particularized and substantial showing of anxiety distinguishable from anxiety suffered by other similarly situated defendants. *Harris*, 15 F.3d at 1565.

Bussart-Savaloja does not set forth any reasons why her anxiety has been particularly acute and offers no support for the fact that delay in sentencing prohibited her from receiving alcohol abuse treatment. She does not state why her grounds for appeal have been impaired by the delay. Finally, and importantly, Bussart-Savaloja's sentence was stayed pending the appeal and so she has not suffered the impairment of liberty that comes with incarceration pending appeal. The fourth and final factor weighs against Bussart-Savaloja.

### Balancing the factors

Having considered the four factors of the balancing test, we have concluded that two factors weigh in favor of Bussart-Savaloja and two factors weigh against her in determining whether she has suffered cognizable constitutional delay. Where the appellant has received a suspension of sentence pending appeal, her liberty was not impacted by the delay. This consideration, coupled with her failure to assert the right and her inability to make a particularized and substantial showing of anxiety, weigh heavily against Bussart-Savaloja. As noted by the Tenth Circuit, the necessity of showing substantial prejudice dominates the *Barker* test once a defendant has been convicted, and the first and second *Barker* factors do not compensate for a failure to timely assert the right or allege substantial prejudice. *Yehling*, 456 F.3d at 1245-46. For these reasons, we conclude that Bussart-Savaloja has failed to establish the delay in the appeal process has deprived her of due process.

### Does the Admission of a Refusal to Consent to a Blood Test Violate the Fourth Amendment, Rendering K.S.A. 8-1001(i) Unconstitutional?

Bussart-Savaloja next challenges the admission into evidence of her refusal to submit to blood testing, arguing that admission is prohibited by the Fourth Amendment thus rendering K.S.A. 8-1001(i) unconstitutional. Although there was no objection to the admission of this evidence at trial and no constitutional challenge to the statute, we elect to address the challenge for the first time on appeal because it involves only a question of law arising on

proved or admitted facts and may be finally determinative of the case. See *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008).

A statute is presumed constitutional, and if there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the Constitution before it may be struck down. *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992).

The statute at issue, K.S.A. 8-1001(a), provides in material part:

"Any person who operates or attempts to operate a vehicle within this state is deemed to have given consent, subject to the provisions of this act, to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs."

K.S.A. 8-1001(i) provides:

"The person's refusal shall be admissible in evidence against the person at any trial on a charge arising out of the alleged operation or attempted operation of a vehicle while under the influence of alcohol or drugs, or both."

It has been established that a defendant's right to refuse consent in the context of driving under the influence is different from other areas. This court has described K.S.A. 8-1001 as a "remedial law" and stated that it "should be liberally construed to promote the health, safety and welfare of the public." *Kim v. Kansas Dept. of Revenue*, 22 Kan. App. 2d 319, 323, 916 P.2d 47, *rev. denied* 260 Kan. 994 (1996). The statute's purpose is to coerce submission to chemical testing through the threat of statutory penalties such as license revocation and the admission into evidence in a DUI proceeding of the fact of a test refusal. *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 835, 888 P.2d 832 (1995); see *State v. Felder*, No. 96,538, unpublished opinion filed May 25, 2007, *rev. denied* 284 Kan. 984 (2007).

Kansas cases have rejected the contention that the admissibility of a refusal to take a breath or blood test under K.S.A. 8-1001(i) violates the Fifth Amendment to the United States Constitution. In *State v. Compton*, 233 Kan. 690, 694, 664 P.2d 1370 (1983), the Kansas Supreme Court upheld the admission into evidence of the taking or refusing to take a blood-alcohol test and found that the admission of such evidence does not violate the Fifth Amendment

privilege against self-incrimination. See *State v. Wahweotten*, 36 Kan. App. 2d 568, 583, 143 P.3d 58 (2006), *rev. denied* 283 Kan. App. 2d 933 (2007) (defendant was not faced with a decision to choose between a Fifth Amendment right against self-incrimination and a Fourth Amendment right against unreasonable searches and seizures because defendant's Fifth Amendment right was never implicated); *State v. Henderson*, No. 97,480, unpublished opinion filed September 26, 2008; *State v. Ramirez*, No. 95,699, unpublished opinion filed November 9, 2007.

The United States Supreme Court has also rejected constitutional challenges to the admission of a defendant's refusal to submit to a blood-alcohol test. See *South Dakota v. Neville*, 459 U.S. 553, 563, 74 L. Ed. 2d 748, 103 S. Ct. 916 (1983), where the Court upheld a statute against Fifth Amendment self-incrimination challenges and due process challenges. The Court's reasoning, however, is applicable to a Fourth Amendment challenge as well. The Court distinguished the case from a previous case in which the Court heard a Fifth Amendment challenge to the practice permitting prosecutors to comment on a criminal defendant's election not the testify. See *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229, *reh. denied* 381 U.S. 957 (1965). The Court reasoned that "[u]nlike the defendant's situation in *Griffin*, a person suspected of drunk driving has no constitutional right to refuse to take a blood-alcohol test." *Neville*, 459 U.S. at 560 n.10; see K.S.A. 8-1001(f)(B).

Because there is no constitutional right to refuse to be tested, there can be no constitutional bar to the admission of testing evidence. See Melilli, *The Consequences of Refusing to Consent to a Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue*, 75 S. Cal. L. Rev. 901, 922 (2002), arguing "[t]he end result is that, without a constitutionally effective right to block a search or seizure by refusing consent, the refusal of consent is constitutionally irrelevant. There can be no derivative constitutional right to bar evidence of an invocation of something that itself is not a constitutional right."

We apply this commentator's analysis in evaluating Bussart-Savaloja's claim. The Fourth Amendment protects only against un-

reasonable searches and seizures. There simply is no constitutional right to avoid a search conducted upon probable cause. "Therefore, refusal to consent to such a search has absolutely no constitutional significance regarding the reasonableness of the subsequent search, and is not an invocation of any right whatsoever." 75 S. Cal L. Rev. at 920. For these reasons, we reject Bussart-Savaloja's constitutional challenge to K.S.A. 8-1001(i).

### Did the District Court Violate Sixth and Fourteenth Amendment Rights when it Enhanced Bussart-Savaloja's Sentence Based on a Fact Not Proven to a Jury?

Finally, Bussart-Savaloja argues that the district court should have been required to prove her prior conviction to a jury beyond a reasonable doubt. Bussart-Savaloja relies on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), which held that any fact which increases a maximum penalty must be included in the complaint, presented to a jury, and proven beyond a reasonable doubt.

Bussart-Savaloja acknowledges that adverse Kansas Supreme Court precedent controls this issue but includes it to preserve the issue for federal review. In Kansas, this issue is controlled by *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). This court is duty bound to follow this precedent absent some indication that the Supreme Court is departing from its position. *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007). The Supreme Court has reaffirmed *Ivory*. See *State v. Gonzalez*, 282 Kan. 73, 116-18, 145 P.3d 18 (2006). Therefore, enhancement of a sentence by reason of a prior conviction does not violate a defendant's constitutional rights under the Sixth and Fourteenth Amendments.

Affirmed.